U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUN 1 4 2010

CLERK, U.S. DISTRICT COURT
By _____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JAMES C. SEIBERT, | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:09-CV-90-A |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
| DEFENDANT. | § | |

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation

of the United States Magistrate Judge are as follows:

I. FINDINGS AND CONCLUSIONS

A.    Statement of the Case

Plaintiff James Seibert filed this action pursuant to Sections 405(g) and 1383(c)(3) of

Title 42 of the United States Code for judicial review of a final decision of the Commissioner of

Social Security denying his claims for disability insurance benefits under Title II and

supplemental security income ("SSI") benefits under Title XVI of the Social Security Act

("SSA").   On February 4, 2003, Seibert applied for disability insurance and SSI benefits[1]

---

[1]The application for SSI benefits had a protective filing date of January 22, 2003.  (Tr. 19.)  In addition, Seibert was last insured on March 31, 2004 for purposes of his disability insurance benefits claims.  (Tr. 20, 163, 182.)

alleging that he had become disabled on March 15, 2000. (Transcript ("Tr.") 19, 158-61, 549-50; *see* Tr. 182-84.)

His applications were denied initially and on reconsideration. (Tr. 19, 56-62, 65-68, 552-62; *see* Tr. 63, 69-70.) The ALJ held a hearing on July 14, 2004 and issued a decision on September 9, 2004 that Seibert was not disabled. (Tr. 19, 43-51.) Subsequently, on September 10, 2004, Seibert filed another claim for SSI benefits, which was allowed on February 15, 2005 ("subsequent allowance"). (Tr. 34.) On July 20, 2005, the Appeals Council notified the claimant that it was reopening the subsequent allowance determination, consolidating the claims, vacating the ALJ's September 9, 2004 decision, and remanding the case for a new decision.[2] (Tr. 19, 34-36; *see* Tr. 52-55, 94-95.) The ALJ held a subsequent hearing on January 3, 2008, and issued a decision on May 28, 2008 that Seibert was not disabled. (Tr. 16-27.) Seibert filed a written request for review, and the Appeals Council denied Seibert's request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 7-10, 13-15.)

B.     Standard of Review

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA. In addition, numerous regulatory provisions govern disability insurance and SSI benefits. *See* 20 C.F.R. Pt. 404 (disability insurance); 20 C.F.R. Pt. 416 (SSI). Although technically governed by different statutes and regulations, "[t]he law and regulations governing the determination of disability are the same for

---

[2]Apparently the State agency had determined on February 15, 2005, that Seibert's impairment met the requirements of Section 12.03 of the Listing and established an onset of disability date of April 10, 2004. (Tr. 19, 34-36.) The Appeals Council, however, reopened the case after determining that the evidence did not support such a finding. (*Id.*)

2

both disability insurance benefits and SSI." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920 (2009). First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the claimant to show he is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other

3

gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

C.   Issues

1. Whether the ALJ properly weighed the medical opinions of the treating source and the state agency medical consultants.

2. Whether the ALJ properly incorporated all of the limitations he found supported in the record into the hypothetical question presented to the vocational expert.

3. Whether the ALJ erred by failing to consider all of the vocational expert's testimony.

D.      Administrative Record

1.    Relevant Treatment History[3]

In late January 1999, Seibert was treated at John Peter Smith Hospital. (Tr. 264-79.)  He reported that he was homeless and experiencing a variety of symptoms, including feeling depressed and having suicidal ideations. (Tr. 264, 266, 274.)  He was diagnosed with depression and personality disorder, and his Global Assessment of Functioning ("GAF")[4] ranged from 30 at admittance to 55 at discharge.[5]  (Tr. 264, 277.)

Seibert received treatment at the Mental Health Mental Retardation Clinic ("MHMR") from 1999 to  2007.  (*See, e.g.,* Tr. 311-91.)  In 1999, Seibert experienced a wide variety of symptoms ranging from feeling depressed, suicidal, tired, and stressed to feeling "good" and "fine," and he often stated that he had not been compliant with taking his medication. (*See, .e.g.,* Tr. 347, 351-52, 354, 356, 361, 371, 374, 376-77.)   In February 2000, medication records at MHMR indicated that Seibert had not been taking his medication for two months. (Tr. 320.) Seibert reported that he had never been happy with the side effects of his medications and that he was feeling tired, nervous, anxious, tense, and having problems sleeping. (Tr. 320, 322.)

---

[3]Because Seibert's arguments in his brief raise issues relating solely to his mental impairments, the Court will review only the medical evidence relating to such impairments.

[4]A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994) (DSM-IV).

[5]A GAF score of 21 to 30 reflect behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. DMS-IV at 34. In addition, a GAF score of 51 to 60 reflects moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV at 34.

In a Mental Residual Functional Capacity Assessment ("MRFC"), A. Boulos, M.D., a state agency medical consultant ("SAMC"), opined on March 17, 2003 that Seibert was moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. 284-85.)  In a written narrative, Boulos stated, "The claimant retains the abilities to understand and carry out detailed but none [sic] complex tasks, to interact with co-workers and supervisors and to adapt to routine changes in work setting."  (Tr. 286.)  The MRFC was affirmed by Richard Alexander, M.D., also a SAMC, on June 26, 2003.  (Tr. 286.)

In a Psychiatric Review Technique Form ("PRTF") also dated March 17, 2003, Boulos opined that Seibert suffered from a schizoaffective disorder and bipolar disorder, neither which precisely satisfied the criteria of Section 12.04 of the Listing.  (Tr. 291; *see* Tr. 288-301.) Boulos found that Seibert was mildly restricted in his activities of daily living and moderately limited in maintaining social functioning and concentration, persistence, or pace.  (Tr. 298.)  He further stated that Seibert's alleged limitations due to his mental impairments were not fully supported by the evidence of record.  (Tr. 300.)  Richard Alexander affirmed the PRTF on June 26, 2003.  (Tr. 288.)

A Disability Determination and Transmittal ("DDT") Form, dated May 13, 2003 and signed by Paul Sundin, M.D., indicated that Seibert was diagnosed, *inter alia*, with schizoaffective disorder and was not disabled.  (Tr. 41; *see* Tr. 551.)  A DDT Form, dated June

6

26, 2003 and signed by L. Goodman, M.D., affirmed the original determination of May 13, 2003. (Tr. 42.)

From 2003 to 2007, Seibert was often treated at MHMR by Garrick Prejean, M.D.  In January 2003, Prejean diagnosed Seibert with schizoaffective disorder.  (Tr. 326.)  Prejean noted in February 2003 that Seibert looked and sounded good and appeared more relaxed.  (Tr. 318.)  In February and April 2003, Prejean rated Seibert's overall functioning at 7 (on a scale from 0 to 10 with 10 being the highest) and his GAF score increased from 55 to 60.  (Tr. 317, 319.)  In July 2003, Prejean rated Seibert's overall functioning at 5 and his GAF score at 50.[6]  (Tr. 315.)  MHMR progress notes dated December 12, 2003 indicated that Seibert was experiencing an increase in depression and his GAF score was rated at 52.  (Tr. 403-04.)  In March 2004, Prejean rated Seibert's overall functioning at 5 and his GAF at 48.  (Tr. 398.)  In May and August 2004, Prejean rated Seibert's GAF score at 50.  (Tr. 395, 409.)

In a Medical Evaluation Interrogatory dated March 8, 2004, Prejean stated that he had been treating Seibert from January 22, 2003 through March 5, 2004, and he opined that Seibert suffered from a schizoaffective disorder.[7]  (Tr. 391.)  He stated that Seibert had extreme difficulties in maintaining social functioning, dealing with changes in routine work setting and dealing with work stresses. He also found that Seibert was markedly restricted in his activities of daily living and had marked deficiencies of concentration, persistence, or pace, and in

---

[6]A GAF score of 41 to 50 reflects serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV at 34.

[7]In his brief, Seibert notes that one of the pages of Prejean's March 8, 2004 Medical Evaluation Interrogatory is missing and requests that the Commissioner be ordered to supplement the transcript to include the missing page. (Pl's. Br. at 4.) The Commissioner, on September 16, 2009, filed a Notice of Filing Additional Transcript Page, which included the missing page.

7

responding appropriately to supervision, co-workers, and usual work situations. He also found that Seibert had moderate difficulties in understanding, carrying out and remembering simple instructions. (Tr. 391-92.) Prejean stated that Seibert had constant episodes of decompensation of extended duration and that his mental impairment would last "[i]ndefinitely/[p]ermanently." (Tr. 392.) He opined that Seibert became unable to work in January 1999 and that he could not work a full eight-hour workday. (*Id.*)

In a "Disability Report-Appeal" Form, dated October 31, 2004, Seibert stated that his condition had worsened, he was having delusions all the time, and people were following him. (Tr. 228; *see* Tr. 228-35.) In a Daily Activity Questionnaire ("DAQ") dated December 16, 2004, Seibert reported that he was hearing voices, being followed, and having hallucinations. (Tr. 238.) He stated that on an average day he would watch television and look for work and that he was able to cook for himself, do household chores, go grocery shopping, and drive a car. (Tr. 239.) He further indicated that he was receiving treatment at a clinic every six to eight weeks. (Tr. 238.)

In January 2005, Seibert reported that he was feeling more motivated and comfortable around people, looking for a job, and getting out more. (Tr. 524, *see* Tr. 522.) His GAF score was rated at 49. (Tr. 525.) In a Psychiatric Review Technique Form ("PRTF") dated February 7, 2005, Jim Cox, Ph.D., a SAMC, indicated that Seibert suffered from schizophrenia that met Section 12.03 of the Listing. (Tr. 411; *see* Tr. 411-422.)

In September 2005, Seibert reported that he had been hearing voices and having suicidal thoughts after he had stopped taking his medication for a few days when he was moving into his new apartment. (Tr. 503.) He stated that the voices and thoughts decreased once he started

8

taking his medications again regularly. (*Id.*) Prejean rated his overall functioning at 5 and his GAF score at 47. (Tr. 506.)

From December 2005 through May 2006, Prejean rated Seibert's GAF score at 50. (Tr. 479, 487, 498.) Seibert, in May 2006, reported that he was attending counseling sessions, which were helping him cope better. (Tr. 475.) He stated that "his voices are more infrequent and easier to tolerate now." (*Id.*) In August 2006, Seibert described himself as doing "fairly well" and his GAF score was rated at 52. (Tr. 468-69.) Prejean rated Seibert's GAF score at 50 in November 2006 and February 2007 (Tr. 452-53, 462) and at 43 in April 2007 (Tr. 442).

In March 2007, Michael Bridgewater, Ph.D., performed a psychological examination on Seibert. (Tr. 423-30.) Bridgewater noted that Seibert "appeared to have some credibility." (Tr. 423.) Seibert reported that he had been experiencing auditory and visual hallucinations and paranoia since October 2002, but that he was not currently experiencing auditory hallucinations due to his medications. (Tr. 424-25.) Seibert also indicated that on an average day he watched television, sang and prayed, ran errands, and exercised three days a week. (Tr. 424.) He reported that he got along well with his family members and that he was currently separated from his wife. (Tr. 424-25.) Bridgewater noted that there was no evidence of any "underlying idiosyncratic, unusual, or bizarre ideation" with Seibert's thought process and that Seibert "seemed preoccupied with the fact that he should qualify for disability." (Tr. 426.)

In addition to interviewing Seibert, Bridgewater administered several tests to Seibert and found that the results of all the tests, except for the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") Test, were an accurate indication of his current level and style of functioning. (Tr. 427.) As to the MMPI-2 Test, Bridgewater, finding that it was clearly invalid, stated:

9

> The major clue that the fake bad profile is present is a response set where the level of elevation on the F scale and the clinical scales seems to be far greater than would be expected given the person's history and the observations made during interview and/or testing.

(Tr. 429.) Bridgewater diagnosed Seibert with schizoaffective disorder, noting that such diagnosis was largely based upon the records supplied by the Disability Determination Service and rated his GAF at 55. (Tr. 430.) Bridgewater opined, based on his mental status interview with Seibert, that Seibert was moderately restricted in his ability to understand, remember, and carry out detailed instructions, interact appropriately with supervisors, and respond appropriately to work pressures in a usual work setting. (Tr. 432.) He further stated that Seibert was slightly restricted in his ability to interact appropriately with the public and co-workers and to respond appropriately to changes in a routine work setting. (*Id.*)

In a letter dated April 26, 2007 and addressed to "To Whom It May Concern," Prejean stated:

> Mr. James Siebert [sic] has been under my care for treatment of schizoaffective disorder . . . since January, 2003. . . .

> It is my medical opinion that Mr. Siebert [sic] has been medically disabled since January 2003 at least and that he remains disabled. He is unable to work, and the stressors of work would almost surely exacerbate his symptoms (including depression, anxiety, and hallucinations). I believe his disability to be permanent.

(Tr. 548.) In July 2007, Prejean stated that Seibert seemed to be doing better and rated his GAF score at 48. (Tr. 543-44.)

2. Administrative Hearing

Seibert was born on September 25, 1955, and he earned a Bachelor's Degree from the University of Texas at Arlington. (Tr. 567, 595.) At the July 14, 2004 hearing before the ALJ,

Seibert testified that he last worked in 2000 as a substitute teacher and that he had worked previously as a placement tester, clerk, floral designer, security guard, and orderly in healthcare facilities. (Tr. 568-72, 576.) He stated that he started having delusions and psychotic episodes and hearing voices in approximately 2000. (Tr. 573-74.)

At the January 3, 2008 hearing before the ALJ, Seibert testified that his symptoms had not improved since the last hearing and he was experiencing paranoia. (Tr. 596-97.) He also testified that the last time he worked full-time he felt very paranoid because his boss and assistant manager would point at him and whisper to themselves. (Tr. 596.) He also stated that he applied to be a substitute teacher in 2005 but that he was not hired to a full-time position due to a previous allegation of misconduct. (Tr. 597-98.) He testified, in essence, that at every job he had in the past few years, he always felt like his supervisors were watching him and talking about him. (Tr. 599.)

John Simonds, a medical expert ("ME"), also testified at the hearing. After summarizing Seibert's medical records, Simonds opined that Seibert's mental impairments did not meet or equal any section in the Listing but that Seibert should have "[m]inimal contact with public and co-workers, low detailed work, and no limitations really on physical." (Tr. 602.)

Shelly Eike, a vocational expert ("VE"), also testified at the hearing. The ALJ asked her to consider the following hypothetical:

> [A] hypothetical individual who is a younger individual or closely approaching advanced age. Consider both. The individual has a high school education, plus a bachelor's degree. The individual has the same work history as Mr. Seibert [sic]. Also assume the individual has the following residual functional capacity. The individual has no limits physically, but the individual's limited to jobs to the reasoning development level of one through three as defined in the Dictionary of Occupational Titles. And finally the individual [is] limited to

11

no more than incidental contact with the public and co-workers. Assume further
the individual could not perform any of Mr. Siebert's [sic] past relevant work. In
your opinion are there jobs that existing [sic] in significant numbers in the
national economy that such a person could perform?

(Tr. 607.)  Based on this hypothetical, Eike testified that there were jobs such a person could

perform, including as a laundry worker, housekeeping cleaner, and hand packager. (*Id.*)

    3.  ALJ Decision

The ALJ, in his May 28, 2008 decision, found that Seibert had not engaged in any

substantial gainful activity at any time subsequent to March 15, 2000, the alleged onset date of

disability. (Tr. 20.) He further found that Seibert had the severe impairment of schizoaffective

disorder.   (Tr. 20.)   He held that Seibert did not have an impairment or combination of

impairments that met or equaled the severity of any impairment in the Listing. (Tr. 21.) As to

the Seibert's RFC, the ALJ stated:

> Mr. Seibert retains the residual functional capacity for work at all
> exertional levels, with no physical limitations, except he is limited to jobs with a
> reasoning development level of 1, 2, or 3 (as defined in the *Dictionary of
> Occupational Titles*) and to jobs requiring no more than incidental contact with
> the public and co-workers.

(Tr. 21.) In support of this RFC assessment, the ALJ stated, as relevant here:

> At the hearing, Dr. Simonds testified as follows:

> Most of the medical evidence reflects psychiatric issues. . . . The
> psychiatric evidence goes back to 1999 or 2000 and shows mostly treatment by
> antidepressant medication. In January 2003 his hallucinations were more marked,
> but he was much improved within a month following the beginning of treatment,
> with only minimal hallucinations, moderate anxiety, and mild depression. In
> 2004 he exhibited the same pattern, but in January 2005 he was stable with
> medication and motivated to work. In 2006 he was also doing okay. In March
> 2007 he had no disturbance of thinking or hallucinations, and he was provided a
> GAF rating of 55. There is no evidence of listing-level severity. Dr. Prejean's
> opinions that Mr. Seibert has been unable to work are inconsistent with the

evidence that the claimant's symptoms had essentially subsided. Mr. Seibert has no physical limitations, and he is further limited to the low end of detailed work and to incidental contact with the public and co-workers.

I conclude that Dr. Simonds' testimony is well supported by the objective evidence and warrants great weight in this matter.

My finding is also supported by the objective medical evidence and Mr. Seibert's medical treatment history. The record prior to Mr. Seibert's alleged disability onset date shows he presented in January 1999 with suicidal ideations and a one-month history of depression, but I note he was believed to have manipulated the counselor, and there was a question regarding whether he was malingering. By April 1999 he was working.

. . . .

. . . In this case I have determined that Mr. Seibert has only mild limitations in his daily activities, noting, for example, that he prepares meals, performs household chores, shops for groceries, exercises at the YMCA, and runs errands. . . .

. . . I have determined that Mr. Seibert has only moderate limitations in his social functioning, noting that although he apparently self-isolates, he has good relations with family members. . . .

. . . I have determined that Mr. Seibert has only moderate limitations in [the] area [of concentration, persistence, or pace]. He lives alone, manages his own funds, and watches movies, and I find no support in the record for his allegation of a concentration deficit. . . .

. . . .

On the basis of the foregoing evaluation, I have determined that Mr. Seibert's mental impairment does not result in two or more of the "marked" or "repeated" limitations within the "B" Criteria guidelines and does not meet the "C" Criteria. I find that his mental impairment is "severe," but it does not meet or equal any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. However, my residual functional capacity assessment reflects nonexertional imitations in consideration of the above evaluation.

In making this determination, I considered treating physician Dr. Garrick Prejean's March 2004 opinion that Mr. Seibert was unable to work due to marked functional limitations. In December 2003, however, Mr. Seibert had no more than

mild symptoms and denied any side effects to his medication. In April 2003 Dr. Prejean opined that Mr. Seibert's symptom severity was no greater than 2, on a scale of 0-10. Mr. Seibert stated at that time that his medications had been "really helpful," and other medical records confirm that he improves substantially with medication. In July 2003 his depression was rated at a "2" by Dr. Prejean. In March 2004 and again in May 2004, his depression was rated as less than moderate. For these reasons, I find that Dr. Prejean's opinion offers very little probative value in this matter.

I also considered Dr. Prejean's April 2007 statement that Mr. Seibert has been unable to work because of the stressors of employment; but Mr. Seibert was provided a relatively high GAF rating of 55 during a consultative examination only one month earlier, and Dr. Prejean's statement that Mr. Seibert has been consistently compliant with his medication is not supported by the statement of noncompliance from Dr. Prejean's own treatment facility on the same date as his statement. I note the evidence that Mr. Seibert's symptoms were mostly under control only one month earlier. I further note Dr. Simonds' testimony at the hearing that Dr. Prejean's opinions that Mr. Seibert has been unable to work were inconsistent with the evidence that his symptoms had essentially subsided. For these reasons I find that Dr. Prejean's statement warrants very little probative value in this matter.

7. Mr. Seibert's complaints of disabling symptoms and limitations establish some functional limitations but do not establish disability within the meaning of the Social Security Act.

. . . .

The evidence in this matter confirms the existence of an underlying medically determinable mental impairment that could reasonably be expected to produce some functional limitations for Mr. Seibert. However, much of the evidence shows that Mr. Seibert has had only mild or no symptoms, and he has reported that he has been depressed because of his lack of achievements. He obviously believed that he could work as a substitute teacher in 2005 and was not hired due to a past record of misconduct (claimant's testimony). He enjoys a variety of daily activities, as noted above. As mentioned earlier, the record reflects work activity after his alleged onset of disability date. Although that work activity does not constitute disqualifying substantial gainful activity, it does suggest his daily activities have been, at least at times, greater than he has generally reported.

The record shows Mr. Seibert has been treated consistently by MHMR, but the treatment has generally been limited to medication, which mostly controls

14

his symptoms. However, his credibility is called into question by the evidence that he has been noncompliant with his medication and treatment plan. For example, in February 2000, only one month prior to his alleged onset date of disability, he had not taken his medication for two months, and in February 2007 he was not taking his medication as prescribed even though he reported hearing voices and being more depressed than usual.

(Tr. 21-25 (internal citations omitted).)

Based on the RFC assessment, the ALJ opined that Seibert was not able to perform his past relevant work but there were a significant number of jobs that existed in the national economy Seibert could perform. (Tr. 25-26.) Consequently, the ALJ found Seibert was not disabled. (Tr. 26.)

E.   Discussion

1. ALJ's Consideration of Medical Opinions

The first issue is whether the ALJ properly rejected the opinions of Prejean, the treating physician, and the opinions of Boulos, Alexander, and Cox, the SAMCs.

a.   Treating Physician Opinion

Prejean opined in March 2004 that Seibert had marked functional limitations and could not work a full day. (Tr. 392-93.) He also opined in April 2007 that Seibert had been disabled since at least January 2003, his disability was permanent, and he was unable to work. (Tr. 548.) Seibert claims, in essence, that the ALJ improperly discounted Prejean's March 2004 and April 2007 opinions by picking and choosing evidence that supported a denial of benefits while ignoring evidence that supported Prejean's opinions that Seibert was disabled. (Pl.'s Br. at 5.)

As to Prejean's March 2004 opinion, Seibert complains that the ALJ discounted this opinion due to evidence in the record that Seibert was experiencing mild symptoms in 2003 and

2004 but failed to acknowledge the following medical evidence in the record that supported Prejean's opinion: (1) MHMR treatment records that Seibert's GAF declined from a 60 in April 2003 to a 50 in July 2003 (Tr. 315-17) and (2) MHMR treatment records in March and November 2004 that showed an increase in Seibert's symptoms and suspiciousness (Tr. 397, 400, 408). (*Id.*)

As to Prejean's April 2007 opinion, Seibert complains that the ALJ discounted this opinion based on a March 2007 consultative examination in which Bridgewater had rated Seibert's GAF score at 55 and MHMR treatment notes from April 2007 showing that Seibert was not complying with his medication but failed to acknowledge the following medical evidence in the record that supported Prejean's opinions: (1) Bridgewater's opinion that Seibert had a moderate impairment in the ability to interact appropriately with supervisors and respond appropriately to work pressures (Tr. 432) and (2) MHMR treatment notes from November 2006 and February 2007 that Seibert had been mostly compliant in taking his medication (Tr. 452, 461.) (*Id.*) Seibert also argues that the ALJ violated Social Security Ruling ("SSR") 82-59 by failing to ask Seibert "any questions at either hearing about his reasons for not taking medications despite evidence the Seibert had complained to his mental providers about side effects." (Pl.'s Br. at 6; Pl's Reply Br. at 2-3.)

The Fifth Circuit cautions judges not to succumb to the temptation to play doctor because common sense can mislead and lay intuition about medical phenomena are often wrong. *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003). Opinion, diagnoses, and medical evidence from a treating physician who is familiar with the claimant's impairments, treatments, and responses should be given great weight in determining disability. *See Leggett*, 67 F.3d at 566; *Greenspan*,

16

38 F.3d at 237. Controlling weight is assigned to the opinions of a treating physician if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record.   20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995); *Bowman v. Heckler*, 706 F.2d 564, 568 (5th Cir. 1983).   However, the determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence. *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237.   *See also* 20 C.F.R. §§ 404.1527(e), 416.927(e).   Conclusory statements to the effect that the claimant is disabled or unable to work are legal conclusions, not medical opinions, and are not entitled to any special significance. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e); *see also Frank*, 326 F.3d at 620.[8]

In this case, the ALJ, before concluding that Seibert was not disabled, specifically considered Prejean's March 2004 and April 2007 opinions, acknowledging that Prejean was Seibert's treating physician. (Tr. 23-24.) He concluded that Prejean's opinions warranted "very little probative value" due to other evidence in the record, including the following: (1) MHMR treatment records from December 2003 showing that Seibert had no more than mild symptoms

---

[8]When the ALJ rejects the opinion of the treating physician, the Fifth Circuit Court of Appeals has held that "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000) (emphasis in original).   Because Seibert did not identify or brief this specific issue, the Court will not consider whether the ALJ considered such factors or was even required to do so and the issue is deemed abandoned as set forth in the Court's May 11, 2009 Order Directing Case To Be Treated As An Appeal. *See also March v. Comm'r of Soc. Sec. Admin.*, 559 F. Supp. 2d 722, 730 n.5 (N.D. Tex. 2008).

and denied any side effects to his medications, (2) Prejean's notation in the MHMR treatment records dated April 2003 that Seibert's symptom severity was no greater than 2 (on a scale of 0-10) and Seibert's statement that his medications had been "really helpful," (3) other medical records confirming that Seibert improved substantially with medication, (4) Prejean's notation that Seibert's depression was rated at a 2 in July 2003, (5) Prejean's notation that Seibert's depression was rated as less than moderate in March 2004 and May 2004, (6) Seibert's "relatively high" GAF score of 55 from Bridgewater in March 2007, (7) MHMR treatment records indicating Seibert had not been compliant with his medication, (8) MHMR treatment records showing Seibert's symptoms were mostly under control in March 2007, and (9) Simonds' testimony at the hearing that Prejean's opinions that Seibert was unable to work were inconsistent with the evidence that his symptoms had essentially subsided. (Tr. 23-24.)

In this case, the ALJ properly reviewed Prejean's opinions but found that such opinions were contradicted by the majority of the other evidence in the record.[9] In deciding not to assign controlling weight to the opinion of Prejean that plaintiff is disabled, the ALJ, citing to specific evidence in the record in support, explained that the opinions were improperly conclusory and contrary to the substantial evidence in the record. Because the ALJ articulated good reasons for

---

[9]Although Seibert claims that evidence that his GAF score declined from 60 in April 2003 to 50 in July 2003 supported Prejean's opinions, the Court notes that federal courts have declined to find such a strong correlation between an individual's GAF score and the ability or inability to work. *See* 65 Fed. Reg. 50,746, 50,764-50,76565 (Aug. 21, 2000) (Commissioner declines to endorse the GAF scale for use in Social Security and SSI disability programs, and states that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings"). *See, e.g., Kennedy v. Astrue,* 247 F. App'x 761, 766 (6th Cir. 2007); *Wind v. Barnhart,* 133 F. App'x 684, 692 n.5 (11th Cir. 2005); *Glover v. Massanari,* No. 3-00-CV-2088-AH, 2001 WL 1112351, at *7 (N.D. Tex. Sept.14, 2001). Furthermore, although Seibert claims that records from March and November 2004 show Seibert was experiencing increased symptoms and suspiciousness, at both examinations Seibert reported he felt that his medications remained helpful and by August 2004 he reported he was feeling more "normal." (Tr. 397-99, 407, 410.)

rejecting Prejean's opinions and substantial evidence supports his decision, the Court concludes that the ALJ did not err in his consideration or use of Prejean's opinions. Thus, remand is not required as to this issue.

As to the issue relating to SSR 82-59, such ruling provides that when a claimant is failing to follow prescribed treatment that can be expected to restore his ability to work, the ALJ must develop the record to resolve whether the claimant is justifiably failing to undergo the prescribed treatment. SSR 82-59, 1982 WL 31384, at *1-7 (S.S.A. 1982); *see also* 20 C.F.R. §§ 404.1530, 416.930. SSR 82-59 states that the claimant should be given an opportunity to fully express the specific reasons for not following prescribed treatment. In addition, SSR 82-59 requires that the claimant be made aware that his answers will be used in deciding his claim and that continued failure to follow prescribed treatment without good reason can result in a denial of benefits.

The Court, after reviewing the ALJ's decision as a whole, concludes that the ALJ did not base his denial of benefits on Seibert's non-compliance with taking his medication but, instead, found that such non-compliance was one factor that undermined the credibility of Seibert and Prejean. Because the case does not fall squarely under Ruling 82-59, "any lack of notice and opportunity required by that ruling does not give rise to reversible error." *C.M.F. v. U.S. Comm'r of Soc. Sec. Admin*, No. 08-CV01942, 2009 WL 5175187, at *4 (W.D. La. Dec. 18, 2009). *Cf. Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) (stating that because there was no evidence, besides the claimant's own testimony, that he was disabled with or without regular medical treatment, the ALJ was not precluded from relying upon the lack of treatment as an indication that the claimant was not disabled); *Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir. 1989).

19

b. SAMC Opinions

Seibert also argues that the ALJ erred by not considering the opinion evidence from

Boulos, Alexander, and Cox, all SAMCs, that Seibert was impaired in his ability to respond

appropriately to supervision. (P.'s Br. at 6-7.)  Specifically, Seibert argues that the ALJ never

considered the limitations reported by the SAMCs, which Seibert claims are consistent with the

other medical opinions in the record, in violation of SSR 96-6p.  (*Id.*)

An ALJ is to consider all medical opinions in determining the disability status of a

claimant.  20 C.F.R. §§ 404.1527(b), 416.927(b).  Findings of fact made by state agency medical

and psychological consultants regarding the nature and severity of an individual's impairments

are treated as expert opinion evidence (from non-examining sources) at both the administrative

hearing and Appeals Council levels of administrative review.   20 C.F.R.  §§  404.1527(f),

416.927(f); SSR 96-6p, 1996 WL 374180, at *2-4 (S.S.A. July 2, 1996).  Pursuant to SSR 96-6p,

the ALJ and the Appeals Council are not bound by the state agency physicians' opinions, but

may not ignore them and must explain the weight given to these opinions in their decisions.  SSR

96-6p, 1996 WL 374180, at *2.

In this case, Boulos, a SAMC, opined on March 17, 2003 in a MRFC that Seibert was,

*inter alia*, moderately limited in his ability to interact appropriately with the general public,

accept instructions and respond appropriately to criticism from supervisors, and get along with

co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. 284-87.)

In a written narrative, Boulos also stated, "The claimant retains the abilities to understand and

carry out detailed but none [sic] complex tasks, to interact with co-workers and supervisors and

to adapt to routine changes in work setting." (Tr. 286.)    The MRFC was affirmed by Richard Alexander, M.D., also a SAMC, on June 26, 2003. (Tr. 286.)

Boulos, in a PRTF dated March 17, 2003, also opined that Seibert suffered from a schizoaffective disorder and bipolar disorder. (Tr. 291; *see* Tr. 288-301.)  He found that Seibert was, *inter alia*, mildly limited in his activities of daily living and moderately limited in maintaining social functioning and concentration, persistence, or pace. (Tr. 298.)  Alexander also affirmed the PRTF on June 26, 2003. (Tr. 288.)10

The ALJ, in assessing Seibert's RFC, reviewed the evidence in the record regarding Seibert's mental impairments, including the following: (1) the testimony of Simonds, the ME, at the hearing (Tr. 21), (2) records detailing Seibert's treatment in 1999 (Tr. 22), (3) records of Seibert's treatment at MHMR (Tr. 22), (4) Bridgewater's psychological examination of Seibert in March 2007 (Tr. 423-32), (5) Seibert's testimony before the ALJ (Tr. 22-24), and (6) Prejean's March 2007 and April 2007 opinions (Tr. 23-24). The ALJ stated that Seibert was only mildly limited in his daily activities, noting that he prepared meals, performed household chores, shopped for groceries, exercised at the YMCA and ran errands. (Tr. 22.) He further opined Seibert was moderately limited in his social functioning as he had good relationships with family members. (Tr. 23.) He also stated that Seibert was moderately limited in his ability to maintain concentration, persistence, or pace as he lived alone, managed his own money, and watched movies. (*Id.*)   Based on this evidence, the ALJ opined that Seibert retained the RFC for work at all exertion levels except he was limited to jobs with a reasoning development level

---

[10]In addition, Cox, a SAMC, opined in a PRTF dated February 7, 2005, that Seibert suffered from schizophrenia that met Section 12.03 of the Listing. (Tr. 411; *see* Tr. 411-422.)

of 1, 2, or 3 and to jobs requiring no more than incidental contact with the public and co-workers. (Tr. 21.)

In analyzing the five step sequential evaluation process and concluding that Seibert was not disabled, the ALJ wholly failed to acknowledge his obligation under SSR 96-6p and made no mention of any of the above-referenced SAMCs opinions or the weight he gave to such opinions. In fact, the ALJ's only discussion of any SAMC opinion is a brief reference at Step Two that "in May and June 2003, the State agency determined that Mr. Seifert's [sic] low back pain was 'non-severe'." (Tr. 20.)  The ALJ's failure to discuss the SAMCs' opinions violates the Social Security regulations and SSR 96-6p.  Although ALJs "are not bound by any findings made by State agency medical or psychological consultants," they must consider such findings as opinion evidence.  20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i).  The "[f]ailure to adhere to the procedures proscribed by the Social Security regulations is sufficient ground for reversal and remand of an administrative decision." *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 515 (S.D. Tex. 2003) (citing *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987)).

However, Courts "have declined to reverse and remand on procedural ground when it is clear that the procedural error did not compromise the decision-making process." *Alejandro*, 291 F. Supp. 2d at 515 (holding, in part, that ALJ's failure to expressly consider findings of one SAMC was harmless as there was substantial evidence in the record supporting the ALJ's decision). *See, e.g., Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) ("Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected."); *Turney v. Astrue*, No. 4:08-CV-189-Y, 2009 WL 980323, at *5 (N.D. Tex. Apr. 9,

22

2009) ("The ALJ should have addressed the findings of the state agency medical consultants, but his failure to do so was harmless.")

In this case, Seibert asserts, in essence, that there is no material dispute among the medical sources that he is impaired to some degree in his ability to respond appropriately to supervisors.   (Pl.'s Br. At 6-7.)   The Court agrees.   Boulos, Alexander, Prejean,[11] and Bridgewater,[12] all the physicians in the record who gave an opinion regarding this issue (besides Simonds), opined that Seibert was, at the very least, moderately limited in his ability to either respond to or interact with supervisors, as well as to the public and his co-workers.  However, the ALJ, apparently relying only on Simonds' testimony, limited Seibert to only having no more than incidental contact with the public and co-workers and failed to make any findings regarding his ability to respond to or interact with supervisors.  Although the Court recognizes that the ALJ is not required to discuss each individual finding underlying the functional capacity assessments proposed by the physicians, the Court concludes that, at least under the particular facts of this case,[13] the ALJ should have discussed the SAMC opinions and explained why he failed to

---

[11] Prejean opined that Seibert had, *inter alia*, marked deficiencies in responding appropriately to supervision, co-workers, and usual work situations. (Tr. 391.)

[12] Bridgewater opined that Seibert was, *inter alia*, was moderately restricted in his ability interact appropriately with supervisors and slightly restricted in his ability to interact appropriately with the public and co-workers. (Tr. 432.)

[13] In this case, there is evidence from Boulos, Alexander, Bridgewater, and Prejean, as well as Seibert's own testimony that Seibert was restricted in his ability to interact or respond appropriately with supervisors, as well as with the public and co-workers.  In addition, Eike, the VE, testified that a person that was unable to respond appropriately to a supervisor would not be able to maintain a job. (Tr. 610.)  The evidence in the record indicates that limiting Seibert to only incidental contact with the public and co-workers does not adequately incorporate Seibert's limitations in responding or interacting with supervisors. *See, e.g., Stearns v. Astrue*, No. 6:08-CV-074-C, 2010 WL 1072828, at *6 (N.D. Tex. March 24, 2010) (finding that the ALJ erred in making an RFC assessment as to Plaintiff's mental impairments that only limited Plaintiff to no more than superficial contact with the public when the evidence of record indicated plaintiff also consistently had difficulty interacting appropriately with supervisors).

23

include any restrictions on Seibert's ability to interact or respond to supervisors in the RFC. The ALJ failed to explain how he came to such a conclusion regarding Seibert's ability to interact with co-workers and the public and his findings are contrary to the medical opinions in the record that indicate Seibert also consistently had at least the same difficulty in interacting or responding to his supervisors. Because the ALJ's RFC rests either on the ALJ's faulty interpretation of the medical opinions or his rejection of those opinions without articulating good cause, the Commissioner's decision must be remanded so the ALJ can comply with SSR 96-6p and the applicable regulations.

2. Remaining Issues Regarding the VE

Because remand is required pursuant to the ALJ's error in assessing Seibert's RFC as set forth above, the Court does not consider the remaining issues raised by Seibert related to the VE as they are intertwined and dependent on the ALJ's RFC assessment. However, upon remand, the Court is certain that the Commissioner will include all of Seibert's impairments that are supported in the record in any hypothetical question to the VE and will properly consider all of the VE's testimony in formulating his final decision.

## II. RECOMMENDATION

It is recommended that the Commissioner's decision be reversed and remanded for further administrative proceedings consistent with these proposed findings of fact and conclusions of law.

24

III. <u>NOTICE OF RIGHT TO OBJECT TO PROPOSED</u>
<u>FINDINGS, CONCLUSIONS AND RECOMMENDATIONAND CONSEQUENCES</u>
<u>OF FAILURE TO OBJECT</u>

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The Court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until July 6, 2010. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

IV. <u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until July 6, 2010 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED June 14, 2010.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

JLC/knv

26